**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 23-20880-CIV

INCITATUS REAL ESTATE, LLC,

      Plaintiff,

v.

LANCELOT MIAMI RIVER, LLC,

      Defendant.

_____/

## COMPLAINT

Plaintiff Incitatus Real Estate, LLC files this action against Defendant Lancelot Miami River, LLC.

### NATURE OF THE ACTION

1.    Plaintiff brings this contract claim to recover $855,000.00 for services rendered pursuant to the parties' written agreement.

### PARTIES

2.    Plaintiff is a New York limited liability company with a principal address of 677 Madison Avenue, New York, NY 10065. Plaintiff's members are Alan Ballinger, a New York resident, and Deborah Schwartz, a New York resident.

3.    Defendant is a Florida limited liability company with a principal address of 9050 Pines Boulevard, Suite 301, Pembroke Pines, FL 33024. Defendant's member is Adler Lancelot Manager, LLC, a Florida limited liability company with a principal address of 9050 Pines Boulevard, Suite 301, Pembroke Pines, FL 33024, whose members are David Adler, a Florida resident, Tina Spano, a Florida resident, and Jonathan Raiffe, a Florida resident.

## JURISDICTION AND VENUE

4.      There is complete diversity between the parties pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of New York, inclusive of its members, and Defendant is a citizen of Florida, inclusive of its members.

5.      The amount in controversy requirements of 28 U.S.C. § 1332 are satisfied in that there is more than $75,000.00 at issue, exclusive of costs, interest, and attorneys' fees.

6.      This action properly lies in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because facts giving rise to this action occurred within this District, Defendant's principal address and residence are in this District, and the real property connected to this dispute is in this District.

7.      Venue is appropriate in this court.

## FACTS COMMON TO ALL ALLEGATIONS

8.      Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set out herein.

9.      Plaintiff's members are experienced professionals with more than 80 years of combined real estate, investment, and related experience.

10.     Defendant is a holding company affiliated with, and controlled by, the Adler Group. For purposes of the Complaint, as applicable, allegations of actions taken by the Adler Group or representatives of the Adler Group constitute allegations of actions applicable to, and imputed to, Defendant.

11.     The "Adler Group" or "Adler Development" is a real estate development organization claiming to have developed "millions of square feet of residential, commercial, and retail projects throughout Florida." On its website, the Adler Group says that it has "developed and

acquired" over "20 million square feet of industrial, office, and retail real estate and over 8,000 residential units."

12.     On July 29, 2015, Defendant acquired title to a parcel of real property in downtown Miami known as "Nexus Riverside" with street addresses of 230 SW 3rd Street and 300 SW 2nd Avenue in Miami, 33130 under Folio 01-4137-038-0030 per Miami-Dade O.R. b/p 29721/572 (the "Nexus Riverside Property").

13.     Defendant purchased the Nexus Riverside Property for $14,250,000.00 in 2015, at which time the property was a vacant lot.

14.     In 2020, Defendant sought financing pursuant to a business venture to develop a Class A, 38-story, 428-unit, multifamily rental tower with ground floor retail, designated as "Tower A," on the Nexus Riverside Property.

15.     In 2020, Defendant circulated an offering memorandum whereby Defendant sought $145,000,000.00 in financing for the business venture, including a $58,000,000.00 equity investment and an $87,000,000.00 construction loan for the development of Tower A on the Nexus Riverside Property.

16.     On or about April 16, 2020, Plaintiff and Defendant entered into a Finance Placing Agreement. A true and accurate copy is attached as Ex. A.[1]

17.     Per the Finance Placing Agreement, the "Project" is "Nexus Riverside," or Tower A, located on approximately 0.8 acres with an address of 230 SW 3rd Street in Miami.

---

[1] The April 16, 2020 Finance Placing Agreement reflects Plaintiff's name as Deborah A. Schwartz Real Estate LLC. On August 18, 2020, Deborah A. Schwartz Real Estate LLC changed its name with the New York Secretary of State to Incitatus Real Estate, LLC.  Plaintiff Incitatus Real Estate, LLC possesses all the rights of Deborah A. Schwartz Real Estate LLC under the Finance Placing Agreement.

18.     Per the Finance Placing Agreement, the "Project" was also inclusive of Phases II (also referred to as "Tower B") and III (collectively referred to as the "Subsequent Phase"). Defendant intended to build Tower A and Tower B on the Nexus Riverside Property.

19.     Per the Finance Placing Agreement, which was intended by the parties to pertain to the business venture, Defendant retained Plaintiff to engage in "efforts to finance through debt, equity and/or other capital structure the Project" or to "source the capital stack for the Project from a Financial Participant."

20.     A "Financial Participant" is defined as "a potential source of capital."

21.     The Finance Placing Agreement provided for a six-month "Exclusive Period," during which time Plaintiff would have the exclusive right to engage in efforts to finance the Project or source the capital stack for the Project, excluding Defendant's absolute right to obtain financing for the business venture through its Existing Relations. The identities of the Existing Relations were provided in Exhibit A to the Finance Placing Agreement.

22.     The "Existing Relations" for debt identified in Exhibit A of the Finance Placing Agreement were "TD Bank, City National, Iberia, Santander, Key Bank, Bank of America, Truist (SunTrust/BB&T), Bank of Ozarks, Synovus."

23.     The "Existing Relations" for equity identified in Exhibit A of the Finance Placing Agreement were "Barings, Mass Mutual, GTIS, CIM, Cresset, Wexford, Atlantic America Opportunities Fund (and affiliates), Canyon Capital."

24.     The Finance Placing Agreement, executed on April 16, 2020, provided that the Exclusive Period would commence when the final offering memorandum was completed. The final offering memorandum took three months to complete, following execution of the Finance Placing Agreement, and the Exclusive Period commenced in mid-July 2020.

25.     The "Fees" section of the Finance Placing Agreement provided that a Financing Fee shall be earned by Plaintiff and payable by Defendant upon (1) a jointly executed agreement for the financing of the Project by the Financial Participant, and (2) the initial funding of the Project by the Financial Participant.

26.     The Finance Placing Agreement, and particularly the fees section, provided for Plaintiff to be paid fees if the Defendant participated in a joint venture arrangement.

27.     The Finance Placing Agreement also provided for payment of Fees to Plaintiff even upon a change of Defendant's corporate form, capitalization table, or management personnel.

28.     The fee schedule set forth a fee structure as follows: equity and preferred equity fees would be paid as 1.5% of the amount of the financing, mezzanine debt or hybrid would be 1.0%, and debt would be 0.75% of the amount of the financing, debt, or equity contribution.

29.     The Finance Placing Agreement did not contain a fixed end date. Defendant was permitted to terminate the agreement upon 30 days' notice "for any reason or no reason." The Finance Placing Agreement could be terminated immediately if Plaintiff engages "in any unlawful conduct or material[] breach of this Agreement." In the event of a material breach other than Sections II, IV, VIII or IX, Plaintiff shall be entitled to written notice and a reasonable opportunity to cure.

30.     Per the Post Term Protection provision, Plaintiff's fees are still owed after termination as long as, *inter alia,* within 15 days after the termination, Plaintiff provides Defendant with a written list of Financial Participants with whom Plaintiff exchanged written correspondence during the pendency of the agreement.

31.     Per the Post Term Protection provision, *inter alia*, Plaintiff is also entitled to its fee if a transaction closes within 18 months of the agreement's termination or expiration.

32.     The Finance Placing Agreement also provided for Plaintiff to be compensated for a Subsequent Phase of the Project.

33.     The Finance Placing Agreement contains a merger clause.

34.     CrossHarbor Capital Partners ("CrossHarbor") is not among the Existing Relations in the Finance Placing Agreement.

35.     In July 2020, at the commencement of Plaintiff's six-month Exclusive Period, Plaintiff engaged in efforts to finance the Project through equity and Plaintiff sourced, consulted, and connected Defendant with CrossHarbor, a Financial Participant.

36.     CrossHarbor is an investor that deploys capital pursuant to business ventures in, *inter alia*, Opportunity Zones. The Nexus Riverside Project is in an Opportunity Zone.

37.     As Plaintiff engaged in efforts to finance the Project through equity, Plaintiff introduced Defendant to CrossHarbor in addition to Plaintiff's work consulting and sustaining discussions between Defendant and CrossHarbor.

38.     On July 23, 2020, at Defendant's request, Plaintiff obtained CrossHarbor's execution of a non-disclosure agreement with Defendant.

39.     From July 2020 through November 2020, Plaintiff facilitated communications between CrossHarbor and Defendant. CrossHarbor was interested in the Nexus Riverside Project and CrossHarbor asked Plaintiff to reach out to Defendant for additional information.

40.     On November 26, 2020, Plaintiff sent Defendant a written memorandum summarizing CrossHarbor's outstanding questions about the business which included business-related matters such as exit assumptions, environmental insurance, Defendant's experience with the general contractor, the rigidity of the contractor's pricing, debt term sheets, the timeline for the

equity sourcing, closing, commencement of the construction, and the current status of Defendant's affiliated project on the adjacent property.

41.     On November 30, 2020, one of Defendant's principals corresponded back with Plaintiff's principal and Defendant's principal stated, "[i] would be great if you could help answer some of the questions or find the answers" to the questions posed by CrossHarbor.

42.     On December 14, 2020, Plaintiff sent Defendant a written memorandum identifying CrossHarbor with the notation of "Reviewing deal."

43.     The entirety of Plaintiff's work pursuant to the Finance Placing Agreement was outside the scope of Florida Statutes, Chapter 475 and the U.S. Securities Exchange Act of 1934. Plaintiff and Defendant intended for the Finance Placing Agreement to pertain to a business, rather than real estate, as the transaction between Plaintiff and Defendant was primarily one involving a business interest.

44.     Defendant subsequently led Plaintiff to believe that CrossHarbor had declined to further proceed with discussions about an equity business investment in the development and that CrossHarbor was no longer interested.

45.     In March 2021, the Adler Group's top principal, Michael Adler, told Plaintiff's principal that Defendant had "sold" the Project for $18,000,000.00 to Mill Creek Residential ("Mill Creek") and Adler had an "option" to "come back into the deal."

46.     In March 2021, in separate calls, Michael Adler and Defendant's member Jonathan Raiffe stated that Defendant was "selling" the Project but that Defendant had the right to "come back into the deal."

47.     In March 2021, Plaintiff's principal asked Defendant, through Raiffe, if Mill Creek wanted assistance with equity or debt for the Project. Defendant, through Raiffe, stated to

Plaintiff's principal that Mill Creek "did not need financing." However, despite these communications between Plaintiff and Michael Adler and Raiffe, Defendant failed to apprise Plaintiff that the option to come back into the project had been exercised and the source of equity financing was CrossHarbor, the Financial Participant who Plaintiff introduced to Defendant.

48.     Despite Defendant's statements that it had purportedly "sold" the Project, the Adler Group's website, www.adlergroup.com, contains a section entitled "Development Projects." The Nexus Riverside Project is among the Adler Group's "current" development projects with a "project status" reflecting "in progress." https://adlergroup.com/project/nexus-riverside (last visited March 6, 2023).

49.     Defendant and the Adler Group had been concealing their ongoing communications with Mill Creek and CrossHarbor for equity financing and those conversations occurred behind Plaintiff's back during the Exclusive Period, after the Exclusive Period, and during the Post Term Protection Period.

50.     In September 2021, Michael Adler was nominated to serve as the United States Ambassador to Belgium and he was confirmed on December 18, 2021.

51.     On December 20, 2021, PRNewswire published an article indicating that a 36-story high-rise with 428 apartments is breaking ground on the Nexus Riverside Property and that Mill Creek "is partnering" with "*Adler Development, which served as the land seller and will remain a development partner moving forward*." https://www.prnewswire.com/news-releases/mill-creek-announces-groundbreaking-of-modera-riverside-301447779.html (emphasis added).

52.     On December 22, 2021, the South Florida Business Journal likewise announced that "Mill Creek Residential struck a deal with Adler Group to build a 36-story apartment tower near the Miami River." Per the article, Mill Creek "*entered into a joint venture with Miami-based*

*Adler    Group*."    https://www.bizjournals.com/southflorida/news/2021/12/22/mill-creek-adler-partner-for-moderna-apartments.html (emphasis added).

53.     The December 2021 announcement of a "joint venture" between Mill Creek and the Adler Group is inconsistent with the March 2021 representations by Michael Adler and Raiffe that the Project was supposedly "sold." The notion that the Project was "sold" is also inconsistent with the Adler Group's representations on the Adler Group's website, continuing to this day, which indicate that the Nexus Riverside Project is a "current" development project that is "in progress."

54.     Both December 2021 news articles referenced above also indicated that the transaction involving the Adler Group was brokered by Berkadia.

55.     Upon information and belief, Defendant entered into a brokerage agreement with Berkadia during Defendant's Exclusive Period with Plaintiff.

56.     The South Florida Business Journal reported that the Berkadia brokers "helped the developers arrange the joint venture and obtain a $98.15 million construction loan from Citizens Bank."

57.     The South Florida Business Journal quoted Mill Creek's managing director, who stated that "*Adler will hold a minority interest in the joint venture.* They paid $15 million for the site, plus another $2.9 million in intangible costs." (Emphasis added).

58.     The December 2021 news articles were accurate.

59.     Defendant, the Adler Group, or an Adler Group Related Group, or affiliate, held a minority interest in the joint venture which was to develop the Project under a different name.

60.     On December 29, 2021, a special warranty deed was recorded in the Miami-Dade Official Records whereby the Project was conveyed by Defendant to CH Riverside LLC, with a new folio number 01-4137-038-0035 per Miami-Dade O.R. b/p 32928/3416.

61.     CH Riverside LLC's member is Riverside Miami Apartments JV LLC.

62.     Riverside Miami Apartments JV LLC's member is MCRT Riverside LLC.

63.     MCRT Riverside LLC's member is MCRT South Florida LLC.

64.     MCRT South Florida LLC's member is MCRT Operating Company LLC.

65.     On March 15, 2022, Michael Adler took office as the United States Ambassador to Belgium.

66.     For the entirety of 2021 and 2022, Defendant and the Adler Group continued to conceal from Plaintiff the source of the equity for the Project.

67.     By December 2021, unknown to Plaintiff at the time, Defendant and Mill Creek executed an agreement for the financing of the Project.

68.     Shortly thereafter, CrossHarbor provided the initial tranche of funding, triggering Plaintiff's right to the Financing Fee. However, Defendant kept this information concealed from Plaintiff for another year.

69.     During 2022, the development of the Project at the Nexus Riverside Property, subsequently known as Modera Riverside, moved forward as a joint venture of Defendant and Mill Creek.

70.     During 2022, Defendant asked Plaintiff to find equity for the Tower B site.

71.     On Friday, January 13, 2023, Plaintiff's principal, Alan Ballinger, joined David Adler, Defendant's member and the president of the Adler Group, Morgan Sirlin, the director of investments at the Adler Group, Tim Sterling, the vice president of construction at the Adler Group, and Brandon Miller of Real Estate Equities Corporation, on site at the Nexus Riverside Property.

72.    On January 13, 2023, in the presence of Ballinger, Sirlin, Sterling, and Miller, while on the Nexus Riverside Property, David Adler verbally stated **"Alan Ballinger brought the equity to the Mill Creek deal – CrossHarbor."**

73.    On January 13, 2023, in the presence of Ballinger, Sirlin, Sterling, and Miller, while on the Nexus Riverside Property, David Adler further verbally stated that the "Tower A site" was a "joint venture" with Mill Creek whereby Defendant/Adler Group and Mill Creek each had a 5% interest and **"CrossHarbor had a 90% interest in the equity."**

74.    On January 14, 2023, Plaintiff's principal Ballinger called *his* attorney at Hinshaw & Culbertson LLP, who been representing both Ballinger and Defendant, to report the non-payment of the Financing Fee. The Hinshaw attorney, who had failed to apprise Plaintiff of the terms of the joint venture transaction, recommended to Ballinger that Ballinger should either call David Adler or send David Adler an invoice for payment of the Financing Fee. The Hinshaw attorney stated that Adler had sold its interest to Mill Creek.

75.    On January 16, 2023, as recommended by the Hinshaw attorney who represented Plaintiff and Defendant, Ballinger emailed an invoice to David Adler, Defendant's principal and president of the Adler Group, for $855,000.00, calculated as 1.5% of the approximate $57,000,000.00 equity investment from CrossHarbor. As Plaintiff noted on the invoice, this figure is subject to modification once the actual amount of the equity investment from CrossHarbor is confirmed.

76.    On January 16, 2023, Ballinger sent a text message to Michael Adler, inquiring about Plaintiff's Financing Fee.

77.    On January 17, 2023, in response, Michael Adler, the sitting United States Ambassador to Belgium, texted Ballinger as follows:

I think you're delusional as to the representation that you're saying David made. Further, it seems a shame that if you finally have a valued client where a transaction could be beneficial for all that it never takes place because of this overreaching. I am also personally offended as you are alleging improper conduct. But please do not involve me as because of my official position. I am no longer able to be a decision maker with my company. My advice would be [sic] smart don't make threats, and try to find a win-win for everybody.

78.     On January 17, 2023 the Hinshaw attorney called Plaintiff and Plaintiff's other principal Deborah Schwartz spoke with him. The Hinshaw attorney repeated the assertion that Defendant sold the Project to Mill Creek. The Hinshaw attorney stated that he represented Adler in the purchase and sale agreement with Mill Creek.

79.     On January 17, 2023, Plaintiff's principal Schwartz spoke with Adler's director of investments, Sirlin, and particularly with reference to the identity of the decision-maker regarding payment of Plaintiff's Financing Fee, Sirlin informed Schwartz that "Michael [Adler] runs the business."

80.     On January 17, 2023, Plaintiff's principal Ballinger called the Hinshaw attorney who also represented Defendant. On this call, the Hinshaw attorney told Ballinger that the Hinshaw attorney had only "prepared the purchase and sale agreement."

81.     On the January 17, 2023 call, the Hinshaw attorney claimed to be unaware that Defendant, or the Adler Group, had retained an equity interest in the joint venture. Ballinger asked the Hinshaw attorney if he had reviewed an operating agreement relating to the joint venture. The Hinshaw attorney did not directly answer the question and instead, the Hinshaw attorney proclaimed generally that he was unaware that Defendant or the Adler Group retained an equity interest in the joint venture.

82.     On January 19, 2023, after the site tour and the admissions by David Adler that CrossHarbor *had* contributed the equity, Ballinger called Sirlin on the telephone. On that call,

Sirlin confirmed David Adler's earlier statements that Defendant/Adler Group and Mill Creek each had a 5% interest and CrossHarbor had a 90% equity interest.

83.     On the January 19, 2023 call between Ballinger and Sirlin, in responding to Plaintiff's request for payment of the 1.5% Financing Fee pursuant to the equity contributed by CrossHarbor, Sirlin initially asserted that the failure to pay was because the Adler Group "sold" the Project. Ballinger stated in response that a "sale" had not occurred because the Adler Group was still in the deal and Defendant's arrangement with Mill Creek is a "joint venture."

84.     The transaction involving the joint venture was not a "sale" as the term would have been understood. This was particularly true in the circumstances here where Defendant or a related entity retained an equity stake in the ongoing development venture. Moreover, even if the transaction involving the joint venture were considered a "sale," nominal or otherwise, per the parties' intent, the Financing Fee would still be owed to Plaintiff because the Finance Placing Agreement does not indicate that the Financing Fee is not owed under those circumstances and a change in Defendant's "capital structure" is expressly referenced in the Finance Placing Agreement.

85.     On the same January 19, 2023 call, Sirlin subsequently admitted in effect the real reason for the reluctance in paying the Financing Fee to Plaintiff, which is that payment of the Financing Fee to Plaintiff would diminish the profitability of the Project for the Adler Group because, according to Sirlin, the Adler Group was only entitled to "5% of the promote" and "was not entitled to a development fee" in the joint venture.

86.     The Finance Placing Agreement did not condition Defendant's obligation to pay the Financing Fee on projected profitability or whether Defendant or the Adler Group is entitled to a promote or a development fee.

87.     Despite Sirlin's statement about the margins on the business venture, the Adler Group stands to receive a substantial profit on the Nexus Riverside Project. The land had been acquired for $14,250,000.00 and $18,000,000.00 had already been received pursuant to a joint venture with Mill Creek for the Tower A build. The Adler Group retained the balance of the Nexus Riverside Property, including the Tower B site pursuant to Phases II and III. Because business ventures related to Phases II and III are likely valued in excess of $20,000,000.00, the Adler Group stands to receive a gross potential profit exceeding $23,750,000.00 plus the value of its 5% equity interest in the joint venture with Mill Creek. More than enough capital is available to pay the Financing Fee which Plaintiff earned.

88.     Plaintiff had introduced Defendant to CrossHarbor and Defendant's subsequent clandestine communications, negotiations, and agreements with CrossHarbor for CrossHarbor to provide the equity were not the product of honest and fair dealing on the part of Defendant.

89.     On January 19, 2023, during one of the conversations between Sirlin and Ballinger, Sirlin indicated that major decisions were still being made by Michael Adler, not David Adler, despite Michael Adler's position as a sitting United States Ambassador. Sirlin candidly admitted to Ballinger that the situation with Plaintiff's Financing Fee was "poorly handled."

90.     Between January 18, 2023 and January 23, 2023, as the parties were still operating under the Finance Placing Agreement, Ballinger held a series of calls with Sirlin. On these calls, Defendant engaged Plaintiff in discussions regarding the financing of Tower B and discussions occurred regarding financing fees payable to Plaintiff. However, Plaintiff believed that the compensation offered was too low particularly given Defendant's continuing non-payment of the Financing Fee under the Finance Placing Agreement for the Tower A Project equity.

91.     The parties were not able to reach a resolution on the Financing Fees owed to Plaintiff.

92.     On January 26, 2023, David Adler sent the following email to Ballinger:

Alan,

You are grossly mistaken, and the invoice is rejected as a fabrication. DAS [Plaintiff] was not involved and brought no equity to the negotiations and agreements with Mill Creek and CrossHarbor. Should you choose to pursue your false claim any further, please know that it will be vigorously countered. A formal notice of termination will follow. Please be advised that any future communications from DAS [Plaintiff] should be directed to our counsel…[at] Berger Singerman LLP…

Thank you.
Regards,
David Adler
Lancelot Miami River LLC

93.     On January 26, 2023, Defendant's counsel at Berger Singerman sent a letter to Ballinger proclaiming that Plaintiff's invoice, which was sent on the recommendation of Plaintiff and Defendant's counsel at Hinshaw, was purportedly a "false invoice." In the January 26, 2023 letter, Defendant's counsel at Berger Singerman stated that by "reason of" the "false claim" seeking "unlawful" payment of the Financing Fee in the Finance Placing Agreement, Defendant provided notice of purported "immediate termination" of the Finance Placing Agreement.

94.     On February 6, 2023, within 15 days of January 26, 2023, Plaintiff provided Defendant with a written list of the Financial Participants with whom Plaintiff exchanged written correspondence regarding equity financing during the pendency of the Finance Placing Agreement. CrossHarbor was among those Financial Participants reflected on the list.

95.     Defendant breached the Finance Placing Agreement by failing to pay Plaintiff's Financing Fee without justification.

96.     Plaintiff performed all its obligations, satisfied all contractual conditions precedent, or all conditions precedent were waived or excused.

97.     Plaintiff was not whatsoever in default of the Finance Placing Agreement.

98.     The assertion by Defendant's counsel that Plaintiff's issuance of an invoice was a purported "default" of the Finance Placing Agreement is frivolous. Any assertion that the Finance Placing Agreement was validly terminated the basis of an issuance of an invoice is ineffective.

99.     Plaintiff is also owed any current or future Financing Fee if CrossHarbor or any other Financial Participant provides equity or other financing pursuant to Tower B or pursuant to any Subsequent Phase of the Project.

100.    The Finance Placing Agreement provides that the prevailing party in any lawsuit brought under the agreement shall be entitled to recover all costs and reasonable attorneys' fees from the non-prevailing party.

101.    Plaintiff has retained counsel and agreed to pay reasonable attorneys' fees.

**COUNT ONE – BREACH OF CONTRACT**

102.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-101 of the Complaint as if fully set out herein.

103.    There exists a valid contract, enforceable by Plaintiff against Defendant, to wit, the Finance Placing Agreement.

104.    The Finance Placing Agreement is binding upon Plaintiff and Defendant.

105.    Plaintiff performed all its contractual obligations owed to Defendant under the Finance Placing Agreement.

106.    Plaintiff performed all conditions precedent to performance or such conditions have been waived or excused.

107.     Prior to the filing of this lawsuit, a jointly-executed agreement for the financing of the Project was signed by CrossHarbor and CrossHarbor provided the initial funding for the Project.

108.     Defendant breached the specific terms of the Finance Placing Agreement by failing to perform its contractual obligation to make payment.

109.     In addition, and in the alternative, Defendant breached the implied covenant of good faith and fair dealing which is encompassed in the Finance Placing Agreement by operation of law.

110.     Every contract includes an implied covenant that the parties will perform in good faith.

111.     The contractual duty of good faith and fair dealing makes it unlawful for a contracting party to violate the spirit of the contract by improperly exercising discretion in a way that is not contradicted by the agreement.

112.     The implied covenant of good faith and fair dealing is designed to protect the contracting parties' reasonable expectations.

113.     Where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

114.     Defendant violated the implied covenant of good faith and fair dealing.

115.     Plaintiff had a reasonable contractual expectation, per the express terms of the Finance Placing Agreement, including but not limited to ¶¶ III, VI, XI, XVII, Ex. A, and Ex. B, that Plaintiff's introduction of Defendant to CrossHarbor, resulting in CrossHarbor's issuance of equity for the development of the Tower A Project would result in a Financing Fee.

116.     Plaintiff had a reasonable contractual expectation, pursuant to the specific terms of the Finance Placing Agreement, including but not limited to ¶¶ III, V, VI, XI, XVII, Ex. A, and Ex. B, that Defendant would not thwart or evade Plaintiff's right to a Financing Fee when such attempt to evade the fee would be undertaken pursuant to Defendant's change in corporate form or creation of a joint venture.

117.     Plaintiff had a reasonable contractual expectation, pursuant to the specific terms of the Finance Placing Agreement, including but not limited to ¶¶ III, V, VI, XI, XVII, Ex. A, and Ex. B, that Defendant would not deceptively negotiate behind Plaintiff's back with CrossHarbor or any other Financial Participant when Plaintiff introduced Defendant to CrossHarbor or another Financial Participant.

118.     Plaintiff had a reasonable contractual expectation, pursuant to the specific terms of the Finance Placing Agreement, including but not limited to ¶¶ III, V, VI, XI, XVII, Ex. A, and Ex. B, that Defendant would not hire a broker, including Berkadia, behind Plaintiff's back during Plaintiff's Exclusive Period.

119.     Plaintiff had a reasonable contractual expectation, pursuant to the specific terms of the Finance Placing Agreement, including but not limited to ¶¶ III, V, VI, XI, XVII, Ex. A, and Ex. B, that Defendant would not routinely interact with Plaintiff for over a year while concealing and knowing that Defendant had received equity from CrossHarbor, a Financial Participant introduced by Plaintiff to Defendant.

120.     The application of the covenant of good faith and fair dealing would not contravene any express terms of the Finance Placing Agreement.

121.     The duty of good faith relates to the performance of express terms of the Finance Placing Agreement, including but not limited to ¶¶ III, V, VI, XI, XVII, Ex. A, and Ex. B.

122.    Defendant breached the Finance Placing Agreement by violating the Exclusive Period provision in ¶ III.

123.    Defendant breached the Finance Placing Agreement by violating the Termination provision in ¶ V.

124.    Defendant breached the Finance Placing Agreement by violating the obligation to pay Financing Fees as set forth in ¶ VI.

125.    Defendant breached the Finance Placing Agreement by violating the Post Term Protection provision in ¶ XI.

126.    Defendant breached the Finance Placing Agreement by violating the Existing Relations provision in Ex. A.

127.    Defendant breached the Finance Placing Agreement by violating the Fee Structure provision in Ex. B.

128.    Plaintiff sustained damages as a result of Defendant's breaches of contract.

129.    As a result of Defendant's breaches, Plaintiff has been damaged in the principal amount of $855,000.00 pursuant to the financing of Tower A.

130.    As a result of Defendant's breach, Plaintiff may have sustained additional damages related to the financing of Tower B or any Subsequent Phase.

131.    Plaintiff reserves the right to modify and augment this claim as discovery reveals additional grounds for damages.

132.    Plaintiff is entitled to recover its costs and prejudgment interest.

133.    Plaintiff is entitled to recover its reasonable attorneys' fees pursuant to the contractual provision providing for payment of attorneys' fees.

## COUNT TWO – UNJUST ENRICHMENT

134.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-101 as if fully set out herein.

135.     Count Two is hereby pled in the alternative to Count One and is applicable only if the Court finds that no enforceable contract exists between the parties.

136.     At all relevant times herein, Plaintiff conferred a benefit or benefits on Defendant as set forth above.

137.     Defendant had knowledge of the benefit or benefits that Plaintiff conferred.

138.     Defendant voluntarily accepted, retained, appreciated and received the benefit or benefits that Plaintiff provided to Defendant, at the expense of Plaintiff.

139.     Defendant was enriched by the benefit or benefits provided by Plaintiff.

140.     Defendant unjustly retained a benefit to Plaintiff's detriment.

141.     Defendant's retention of the benefit is unjust.

142.     Defendant's retention of the benefit violates the fundamental principles of justice, equity and good conscience.

143.     Despite the receipt of such enrichments, Defendant refused to compensate Plaintiff for the unjust enrichment in the amount of $855,000.00.

WHEREFORE Plaintiff prays that this Court enter a judgment against Defendant as follows:

A.      Principal damages of $855,000.00;

B.      Contract-based attorneys' fees in an amount to be determined;

C.      Prejudgment interest;

D.      Costs of collection; and,

E.      Such other and further relief as this Court deems just and proper.

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

*/s/ Kenneth E. Chase*
Kenneth E. Chase
Florida Bar No. 017661
kchase@chaselaw.com
Chase Law & Associates, P.A.
1141 71st Street
Miami Beach, FL 33141
Telephone: (305) 402-9800

*Attorneys for Plaintiff Incitatus Real Estate, LLC*

# EXHIBIT A

## FINANCE PLACING AGREEMENT

This Finance Agreement ("Agreement") is entered into this 16th day of April, 2020, between **Lancelot Miami River LLC** having an address at 3150 SW 38th, Suite 530, Miami, FL 33146 ("Lancelot") and **Deborah A. Schwartz Real Estate LLC** having an address at 2385 NW Executive Center Drive, Suite 240, Boca Raton, FL 33431 ("DAS").

**I. Project:** Nexus Riverside ("Project") located on approximately 0.8 acres with an address of 230 SW 3rd Street, Miami, Florida ("Property"). The Project is a Class A multifamily rental building consisting of approximately 430 units and 3,000 square feet of ground floor retail with an estimated cost of $145,000.000, as the same maybe modified or amended from time to time. There are Phases II and III of the Project which for the purposes of this Agreement are referred to collectively as a Subsequent Phase.

**II. Services:** The "Services" of DAS relate to DAS' efforts to finance, through debt, equity and/or other capital structure the Project. Lancelot acknowledges that while DAS has been retained to source the capital stack for the Project from a Financial Participant(s) (as defined below) it is possible that a Financial Participant(s) may request to be involved with the Subsequent Phase from the outset.

DAS acknowledges that Lancelot has prior business relationships with numerous entities which have provided similar services to Lancelot and/or Lancelot Related Entities. A list of those entities ("Existing Relations") is attached hereto as Exhibit "A". DAS shall not solicit any of the Existing Relations. The Services to be provided under this Agreement do not apply to any other development projects or potential development projects by Lancelot, Adler Group, Adler Development or any affiliated entities of Lancelot, Adler Group, Adler Development (collectively, "Lancelot Related Entities").

**III. Term / Exclusive Period:** Lancelot agrees that for six (6) months following the later to occur of the (i) execution of this Agreement and (ii) delivery of an Information Package for the Project ("Exclusive Period"). DAS shall have the exclusive right to source the capital stack for the Project, excluding Lancelot's absolute right to obtain financing through its Existing Relations (during the Excusive Period).

**IV. Information Package:**

   a. Lancelot agrees to provide DAS with information about the Project which may include financial information, decks, architectural plans, information about Lancelot, Lancelot Related Entities and their respective principals, which may be supplemented and amended by Lancelot from time to time (collectively hereafter, "Information Package"). Only in accordance with the terms of this Agreement, may DAS make use of the Information Package in order to perform the Services set out in this Agreement.

   b. Lancelot agrees to indemnify DAS from all claims, damages, costs and expenses, including reasonable attorney's fees, resulting from materially false details within the Information Package or other Project information provided by Lancelot which Lancelot has authorized DAS to provide to a potential source of capital ("Financial Participant" / "Financial Participants"). DAS agrees to indemnify Lancelot and all Lancelot Related Entities from all claims, damages, costs and expenses, including reasonable attorney's fees, resulting from materially false details about the Project, Lancelot or Lancelot Related Entities that DAS provides to third parties or potential Financial Participants.

c. DAS acknowledges that portions of the Information Package are private, privileged and/or trade secret in nature. As such, DAS shall not disclose the Information Package to any third party or potential Financial Participant without both the prior express written consent of Lancelot and Lancelot's receipt of an executed confidentiality agreement (the form for which is attached as Exhibit C) from the potential Financial Participant / third party.

d. DAS shall provide Lancelot with written notice of any Financial Participant DAS intends to approach for performance of DAS' Services. Notwithstanding the foregoing, DAS may solicit a Financial Participant as to potential interest. Within five (5) business days of Lancelot's receipt of the notice, Lancelot shall advise DAS if the potential Financial Participant is acceptable (in Lancelot's sole and absolute discretion). Thereafter, upon Lancelot's (a.) written approval to DAS and (b.) receipt of the executed (by the potential Financial Participant) confidentiality agreement, DAS may then disclose the Information Package to the potential Financial Participant.

**V. Termination:** Notwithstanding anything to the contrary, Lancelot shall have the absolute right to terminate DAS (a.) at any time, for any reason or for no reason, by providing thirty (30) days' written notice to DAS, and (b.) immediately, should DAS engage in any unlawful conduct or materially breach this Agreement. In the event of a material breach other than of Sections II, IV, VIII, or IX, DAS shall be given written notice (of the material breach) and an reasonable opportunity to cure, not to exceed thirty days.

**VI. Lancelot's Sole & Absolute Right:** DAS acknowledges that Lancelot is under no obligation, contractual or otherwise, to accept financing of any type, submitted by or through DAS, and shall have the sole and absolute right to reject any proposal for any (or no) reason whatsoever.

Fees: A Financing Fee for each component of the capital stack is set forth in Exhibit B attached hereto. A Financing Fee payable under this Finance Agreement shall be deemed earned, due and payable only upon the following, which shall collectively be referred to as "Closing": (1) a jointly executed agreement for the financing of the Project between the Financial Participant and Lancelot and (2) the initial funding of the Project by the Financial Participant. In accordance with the terms of this Agreement, a Financing Fee will be paid by the Financial Participant providing the capital (from the proceeds to be paid by the Financial Participant) to DAS, at the closing. Moreover, DAS shall not be entitled to any Fee or compensation if financing is obtained by or through any of the Existing Relations or related entities thereto. In the event that a Financial Participant:
a. makes a binding written commitment to provide financing for both the Project and the Subsequent Phase prior to the date of closing on the Project, and Lancelot agrees to such arrangement, then DAS shall be entitled to the compensation set forth in Exhibit B, but only in accordance with the terms of this Agreement, and, for avoidance of doubt, specifically Section XII of this Agreement.
b. does not make a binding written commitment to provide financing for the Project and the Subsequent Phase prior to the date of closing on the Project, but does provide financing for the Subsequent Phase, then DAS shall be entitled to the compensation set forth in Exhibit B, but only (1.) up to a maximum of $100,000.00, and (2.) in accordance with the terms of this Agreement and, for avoidance of doubt, specifically Section XI of this Agreement.

**VII. DAS' Representation:** DAS represents that prior to commencing any of its services associated in any way with this Agreement, it is or will be duly licensed or otherwise legally authorized by applicable governmental authorities to perform the Services contemplated in this Agreement. DAS shall indemnify and hold Lancelot harmless from all claims, liabilities and damages, including reasonably attorney's fees and expenses, arising from or related to the above material representation being false or otherwise inaccurate.

**VIII. Mutual Representation:** Lancelot and DAS each represent and warrant to each other that they have the full power and authority to enter into this Agreement and that this Agreement, when duly executed, will be a binding and enforceable agreement in

accordance with its terms and conditions. Each party agrees to indemnify the other and hold harmless from all claims, liabilities and damages arising from or related to the above representation being false or inaccurate.

**IX. Limitation:** Lancelot acknowledges that DAS is not a Financial Participant and has no obligations, responsibilities or liability regarding any act or omission of a DAS introduced Financial Participant.

**X. Reimbursement of Expenses:** Lancelot shall be under no obligation to reimburse DAS for any expenses unless approved in writing by Lancelot in advance of any expense having been incurred.

**XI. Post Term Protection:** Lancelot agrees to pay DAS a fee as set out in Exhibit "B" after termination/expiration of this Agreement only if:

(1) DAS was not in material default of the Agreement prior to termination/expiration;

(2) DAS was not terminated pursuant to Section V(b.) of this Agreement;

(3) Within fifteen (15) days after the Agreement's termination/expiration, DAS provides Lancelot a written list of the Financial Participants that DAS has had written correspondence to and written response from regarding the financing of the Project;

(4) DAS assists in the negotiations to the extent requested by Lancelot and the Financial Participant;

(5) A Financial Participant has not paid DAS pursuant to Section VII of this Agreement for the Project; and

(6) A transaction with the identified Financial Participant, with respect to the Project, closes within twelve (18) months of this Agreement's termination/expiration.

**XII. Jurisdiction and Venue:** The parties agree that this Agreement is governed by the laws of Florida. Venue for any dispute or litigation shall be in Miami-Dade County Florida.

**XIII. Waiver of Trial by Jury:** THE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

**XIV. Mutual Attorney's Fees:** Should suit be brought in exercising or enforcing any rights or remedies hereunder or in enforcing any of the terms, conditions, provisions or covenants of this Agreement, the non-prevailing party shall pay to the prevailing party all expenses of such suit and any appeal thereof, including all reasonable attorney's fees.

**XV. Notice:** Except as otherwise authorized or allowed by statute, any notice, demand, request or other communication required or permitted be given under this Agreement shall be in writing, signed by the party giving it and conclusively deemed to have been properly given to and received and to be effective when sent by (i) personal delivery, or (ii) reputable overnight delivery service with proof of delivery, or (iii) United States Mail, postage prepaid, registered or certified mail, return receipt requested, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of facsimile transmission, as of the date of the facsimile transmission provided that an original of such facsimile must also sent to the intended addressee by one of the means described in clauses (i) through (iii) above. The respective addresses of the parties are as hereafter set forth:

**Lancelot Miami River LLC**

3150 SW 38ᵗʰ Avenue, Suite 530
Miami, FL 33146
Attention: Jonathan Raiffe
With a copy via email to: jraiffe@adlergroup.com

Deborah A. Schwartz Real Estate LLC
667 Madison Avenue
5ᵗʰ Floor
New York, NY 10065
Attention: Alan Ballinger
With a copy via email to: redandrussellholdings@gmail.com
Any party hereto may, by giving five (5) days written notice to the other party hereto,
designate any other address in substitution of the foregoing address to which notice shall
be given.

**XVI. Execution:** This Agreement may be executed in counterparts. The delivery of this
Agreement by facsimile or electronic mail by any party shall represent a valid and
binding execution of this Agreement by such party.

**XVII. Merger Clause:** This Agreement constitutes the only agreement(s) of the Lancelot and
DAS, and there is no other agreement, oral or written, between the parties relating to the
subject matter of this Agreement.

Witness: _____

Print Name: **Cristina Mas** _____

On behalf of **Lancelot Miami River LLC,** a
Florida limited liability company

By: _____

Print Name: _David S. Adler___

Its:_Vice President

Witness: _____

Print Name: A l ı n  B a l l i n g

On behalf of **Deborah A. Schwartz Real
Estate LLC**

By: _____

Print Name: _Deborah A Schwartz_

Its: _Member_

Exhibit A
"Existing Relations"

**Debt:**
TD Bank, City National, Iberia, Santander, Key Bank, Bank of America,
Truist (SunTrust / BB&T), Bank of Ozarks, Synovus

**Equity:**
Barings, Mass Mutual, GTIS, CIM, Cresset, Wexford, Atlantic America Opportunities Fund (and affiliates), Canyon Capital

Exhibit B
"Fee Structure"

| | |
|---|---|
| 1. Debt | 0.75% |
| 2. Hybrid | 1.0% |
| 3. Mezzanine Debt | 1.0% |
| 4. Equity<br>Preferred Equity | 1.5% |

5. Joint Venture – In the case where a Financial Participant brings all of the capital stack other than the equity contributed by Lancelot or Adler Related Party, DAS shall be entitled to 1.0% of the capital stack brought by such Financial Participant.

Exhibit C
"Confidentiality Agreement"

(see following four (4) pages)

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (this "**Agreement**") is entered into as of _____ _____, 20____ (the "**Effective Date**"), by and between **Lancelot Miami River, LLC** a Florida Limited Liability Company ("**Lancelot**"); and _____, (the "**Company**"). Lancelot and the Company shall hereinafter be referred to individually as a "**Party**" and collectively as "**Parties**".

**WHEREAS,**    either Party may disclose, from time to time, Confidential Information (as defined hereunder), to the other Party, pertaining to their respective activities, whether financial or other, for the purpose of examining a potential business engagement between the Parties in connection with the Nexus Riverside project, a +/-430 multifamily rental project with +/-5,000 square feet of ground floor retail, to be located at 230 SW 3rd Street, Miami, FL 33130 ("**Purpose**"), and other information deemed by either Party as being Confidential Information; and

**WHEREAS,**    the Parties would like to protect the confidentiality of, maintain their respective rights in, and prevent the unauthorized use and disclosure of such Confidential Information;

NOW, THEREFORE, the Parties hereby agree as follows:

1. **Confidential Information.** The Parties agree that all information disclosed by the disclosing Party to the receiving Party, whether in oral form, visual form or in writing, including but not limited to, all records, data, ideas, projections, plans, marketing information, materials, financial statements, memoranda, analyses, notes, legal documents and other data and information (in whatever form), as well as trade secrets relating to the disclosing Party, and information learned by the receiving Party from the disclosing Party through the inspection of the disclosing Party's materials, that relates to disclosing Party's, designs, business plans, business opportunities, finances, research, development, know-how, personnel or third-party confidential information, will be considered and referred to collectively in this Agreement as "**Confidential Information**". Confidential Information shall not include information that: (i) is now or subsequently becomes generally available in the public domain through no fault or breach on the part of receiving Party; (ii) the receiving Party can demonstrate in its records to have had rightfully in its possession prior to disclosure of the Confidential Information by the disclosing Party; (iii) receiving Party rightfully obtains from a third party who has the right to transfer or disclose it, without default or breach of this Agreement; or (iv) the receiving Party can demonstrate in its records to have independently developed, without breach of this Agreement and/or any use of the Confidential Information. Notwithstanding the above, Confidential Information may be disclosed pursuant to the order or requirement of a court, administrative agency or other governmental body; provided, however, that the receiving Party shall, to the extent lawfully permitted, provide prompt written notice of such court order or requirement to the disclosing Party to enable the disclosing Party to seek a protective order or otherwise prevent or restrict such disclosure.

2. **Non-disclosure and Non-use of Confidential Information.** The receiving Party agrees to accept and use Confidential Information solely for the Purpose. The receiving Party will not disclose, publish or disseminate Confidential Information to a third party other than those of its employees and consultants with a need to know such in connection with the Purpose, and further agrees to take reasonable precautions to prevent any unauthorized use, disclosure, publication or dissemination of Confidential Information, ensure that such receiving Party's employees and consultants fully perform the duties and obligations hereunder and the receiving Party shall remain liable at all times for any acts and/or omissions of its employees and consultants with respect to the disclosing Party's Confidential Information. The receiving Party will immediately notify the disclosing Party in the event of any loss or unauthorized disclosure of any Confidential Information. The receiving Party agrees not to use Confidential Information otherwise for its own or any third party's benefit without the prior written approval of an authorized representative of the disclosing Party in each instance. The receiving Party shall not reverse engineer, decompile or disassemble any Confidential Information disclosed to it by the disclosing Party. In performing its duties and obligations hereunder, the receiving Party agrees to use at least the same degree of care as it does with respect to its own confidential information of like importance but, in any event, at least reasonable care. Further, the receiving Party agrees that it shall not make any copies of the Confidential Information on any type of media, without the prior express written permission of the authorized representative of the disclosing Party.

3. **No License.** All Confidential Information, and any derivatives thereof is and shall remain the property of the disclosing Party and no license or other rights to Confidential Information is granted or implied hereby to have been granted to the receiving Party, now or in the future.

4. **No Warranty.** THE CONFIDENTIAL INFORMATION AND ANY OTHER INFORMATION IS PROVIDED BY THE DISCLOSING PARTY "AS IS", WITHOUT ANY WARRANTY, WHETHER EXPRESS OR IMPLIED, AS TO ITS ACCURACY OR COMPLETENESS, OPERABILITY, USE, FITNESS FOR A PARTICULAR PURPOSE OR NON INFRINGEMENT.

5. **Return of Confidential Information.** Upon written request of the disclosing Party the receiving Party shall: (i) return to the disclosing Party any information disclosed in any tangible form, and all copies thereof (on whatever physical, electronic or other media such information may be stored) containing any of the Confidential Information, if such Confidential Information is stored in electronic form, it is to be immediately deleted; and (ii) provide a certification, in writing, executed by an appropriate officer of the receiving Party, that it has retained no copies of the Confidential Information on any media and that it has retained no notes or other embodiments of the information contained in the Confidential Information. The obligations set forth herein regarding confidentiality and use of Confidential Information shall survive any termination or expiration of this Agreement.

6. **No Obligation or Joint Venture.** Neither this Agreement nor the disclosure or receipt of Confidential Information shall constitute or imply any obligation or intention by either Party

to enter into any business relationship with the other Party. Further, this Agreement is not a joint venture or other such business arrangement, and any agreement, if at all, between the Parties will be set forth in subsequent written agreements, at the absolute and sole discretion of the Parties. For the avoidance of doubt, it is hereby clarified that disclosure of Confidential Information shall be in the sole and absolute discretion of the disclosing Party.

7.   **Relief.** The receiving Party hereby acknowledges that unauthorized disclosure or use of Confidential Information or the material breach of this Agreement could cause irreparable harm and significant injury to the disclosing Party that may be difficult to ascertain. Accordingly, the receiving Party agrees that the disclosing Party, in addition to any other right or remedy that it may have available to it at law or in equity (including the recovery of attorney's fees, expenses and damages, but excluding consequential, special and punitive damages), will have the right to seek and obtain immediate injunctive relief to enforce obligations under this Agreement without the necessity of proving actual damages, posting bond or making any undertaking in connection therewith.

8.   **Governing Law.** This Agreement shall be governed and construed solely in accordance with the laws of Florida, without giving effect to conflicts of law principles thereof, and only the courts in Florida shall have jurisdiction in any conflict or dispute arising out of this Agreement, except for the right of the disclosing Party to apply to any court of a competent jurisdiction, as set forth in Section 7.

9.   **Counterparts.** This Agreement may be executed in counterparts. The delivery of this Agreement by facsimile or electronic mail by any Party shall represent a valid and binding execution of this Agreement by such party.

10.  **Term.** This Agreement shall govern the communications relating to Confidential Information between the Parties during the period of two (2) years as of the Effective Date, unless terminated earlier by either Party upon a thirty (30) day written notice to the other Party. The obligations set forth in this Agreement shall bind the Parties for a period of five (5) years from the date of termination or expiration of this Agreement.

11.  **Assignment.** This Agreement shall not be assignable by either Party without the prior written consent of the other Party, and any purported assignment not permitted hereunder shall be construed as null and void.

12.  **Notice.** Any and all notices required or permitted under this Agreement shall be deemed given if in writing and the same shall be given by a nationally recognized overnight delivery service with a copy via email to the undersigned.

**Lancelot Miami River LLC**                    _____ (the Company)
3150 SW 38th Avenue, Suite 530                 _____
Miami, FL 33146                                _____
Attn: Jonathan Raiffe                          _____
                                               Attn: _____
With a copy via email to:
jraiffe@adlergroup.com
                                               With a copy via email to:

                                               _____

Any party hereto may, by giving five (5) days written notice to the other party hereto, designate any other address in substitution of the foregoing address to which notice shall be given.

13.  **Merger Clause.** This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed herein and supersedes all prior or contemporaneous oral or written agreements concerning such Confidential Information. This Agreement may not be amended except by the written agreement signed by authorized representatives of both Parties.

IN WITNESS WHEREOF, the Parties have caused this Agreement (which may be

executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument) to be executed by their duly authorized representatives, as of the date written above.

| *On behalf of:* | *On behalf of:* |
|---|---|
| **Lancelot Miami River LLC** | *the Company* |

By: _____   By: _____

Name: _____   Name: _____

Title: _____   Title: _____

Email: _____   Email: _____